UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ROBERTO CIAPRAZI,                                    :

                              Plaintiff,             :

            -against-                                :        **REPORT AND RECOMMENDATION**

ALLAN JACOBSON, R. WILLIM, MARY J.    :               13 Civ. 4813 (PAC)(KNF)
D' SILVA, CARL J. KOENIGSMANN,
BRIAN FISCHER,                                       :

                              Defendants.            :
------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE PAUL A. CROTTY, UNITED STATES DISTRICT JUDGE

## INTRODUCTION

Roberto Ciaprazi ("Ciaprazi"), proceeding pro se, commenced this action for damages
and injunctive relief, pursuant to 42 U.S.C. § 1983 and New York law, against Allan Jacobson
("Dr. Jacobson") and R. Willim ("Dr. Willim"), dentists at Sing Sing Correctional Facility, Mary
J. D'Silva ("Dr. D'Silva"), the New York State Department of Corrections and Community
Supervision's ("DOCCS") Director of Correctional Dental Services, Carl Koenigsmann ("Dr.
Koenigsmann"), DOCCS' Chief Medical Officer, and Brian Fischer ("Fischer"), DOCCS
Commissioner.  Ciaprazi alleged the defendants violated his Eighth Amendment constitutional
rights when they showed deliberate indifference to his dental needs.  Before the Court is the
defendants' motion to dismiss the complaint, pursuant to "Rule 12(b)(6) of the Federal Rules of
Civil Procedure because (1) Plaintiff has not stated a valid claim under the Eighth Amendment;
(2) Commissioner and Dr. D'Silva were not personally involved in the alleged constitutional
violation; (3) Defendants are entitled to qualified immunity; and (4) Plaintiff's state claims are

barred by N.Y. Corrections [sic] Law § 24." The plaintiff opposes the motion.

## ALLEGATIONS IN THE COMPLAINT

<u>Upper Left Second Premolar, Tooth No. 13</u>

Ciaprazi is a citizen of Romania; he has been imprisoned in Sing Sing Correctional Facility since 2006. In 2010, Ciaprazi began having repeated bouts of excruciating pain and abscesses in his upper left second premolar, tooth No. 13. He reported several times on an emergency basis to the dental unit at the Sing Sing Correctional Facility, where he was prescribed antibiotics and pain medication, including on May 11, 2010, and May 13, 2011. On November 1, 2010, Dr. Stukes, the Dental Director at the Sing Sing Correctional Facility at that time, advised Ciaprazi that the root canal in tooth No. 13 may be failing and he needed another root canal, but DOCCS policy did not permit her to perform root canal on posterior teeth. Dr. Stukes prescribed antibiotics for Ciaprazi. On May 20, 2011, Dr. Stukes advised Ciaprazi that she made a written referral for him to see a specialist in connection with his No. 13 tooth.

In June 2011, Ciaprazi's dental care was transferred to Dr. Willim. On August 30, 2011, Ciaprazi reported to the dental clinic on an emergency basis with an abscess and severe pain in tooth No. 13 and was prescribed antibiotics. On August 31, 2011, in Ciaprazi's presence, Dr. Willim discovered, for the first time, the existence of Dr. Stukes's referral to the specialist, and promised to schedule Ciaprazi with the specialist in October 2011. Dr. Willim also advised that Ciaprazi needed a surgical intervention on tooth No. 13.

In October 2011, Ciaprazi's dental care was transferred to Dr. Jacobson. In November 2011, Dr. Jacobson advised Ciaprazi that he would not act on Dr. Stukes's referral, because he was "new" and had no duty to act on referrals from previous dentists. Subsequent to Ciaprazi's filing a grievance, in March 2012, Dr. Jacobson claimed that Ciaprazi already had an

2

appointment with a specialist, Dr. Moore, on September 14, 2011, but failed to address his concerns with Dr. Moore at that time.  However, on September 14, 2011, Ciaprazi and two dozen other prisoners were scheduled to have only tooth extractions by Dr. Moore at the Sing Sing Correctional Facility dental clinic, and no consultation, test or diagnosis for any other dental problems were permitted on that day.  On September 14, 2011, Dr. Willim advised Ciaprazi that he was called to the dental clinic only to have Dr. Moore extract a wisdom tooth, and that an appointment concerning his No. 13 tooth was scheduled for October 2011.  On September 14, 2011, Dr. Willim did not advise Dr. Moore to treat Ciaprazi's No. 13 tooth, and the dental clinic was used solely as a tooth extraction site for Dr. Moore during the entire day.  Dr. Moore advised Ciaprazi that the purpose of the appointment was to extract his wisdom tooth.  Dr. Moore did not take any steps to diagnose and treat Ciaprazi's No.13 tooth.

On April 10, 2012, Ciaprazi reported to the dental clinic with an abscess around tooth No. 13, and requested that Dr. Jacobson perform root canal or refer him to a specialist.  Dr. Jacobson advised that he would not perform root canal because he was not allowed to do so by the DOCCS regulation, and that he could only offer a tooth extraction.  Dr. Jacobson prescribed antibiotics and pain medication as a temporary treatment.  Dr. Jacobson also prescribed antibiotics to Ciaprazi on April 26, 2012, in May 2012 and on June 7, 2012, but refused to perform any permanent treatment or act on Dr. Stukes's referral.  Ciaprazi's No. 13 tooth

> has visibly and progressively deteriorated, changing its color from bright white in 2011 to yellow at the present time; I experienced repeated bouts of excruciating pain and severe abscesses during the past two years, a lump grew and remained in the gum surrounding the tooth for several months in 2012; an abnormal tingling/throbbing sensation developed for the past several months in that tooth and the gums surrounding it; I have problems masticating on the left side; there is a risk to my health such as widespread infection, loss of bone and other complications.

3

On February 7, 2012, Ciaprazi filed a grievance concerning Dr. Willim's and Dr. Jacobson's failure to act on Dr. Stukes's referral or provide any permanent treatment, such as root canal. He wrote to Fischer, Dr. D'Silva and Dr. Koenigsmann about the defendants' failure, "including on January 27, 2011 (Koenigsmann and Fischer), February 28, 2011 (Koenigsmann and Fischer), November 18, 2011 (Koenigsmann), December 17, 2011 (Koenigsmann and Fischer), January 23, 2012 (Koenigsmann and Fischer), March 10, 2012 (Koenigsmann and Fischer) and May 28, 2012 (D'Silva, Fischer and Koenigsmann)." Fischer and Dr. D'Silva did not respond. Dr. Koenigsmann responded, contending that Ciaprazi "'had the opportunity to address [my] issues with the oral surgeon' on September 14, 2011."

Upper Right Second Molar, Tooth No. 2

On November 2, 2011, Ciaprazi reported to the dental office on an emergency basis with an abscess and pain in his second upper right molar, tooth No. 2. Dr. Jacobson confirmed that tooth No. 2 is infected and broken partially, and he prescribed antibiotics. Dr. Jacobson advised that, although the tooth could be saved by a root canal, because the DOCCS regulations do not permit root canal on a posterior tooth, he could only offer a tooth extraction. On November 26, 2011, Ciaprazi filed a grievance concerning the denial of treatment for his No. 2 tooth. On May 28, 2012, he wrote to Fischer, Dr. Koenigsmann and Dr. D'Silva, concerning his No. 2 tooth. Fischer and Dr. D'Silva did not respond. Dr. Koenigsmann responded, on June 8, 2012, contending that Ciaprazi refused "'the treatment offered' of extraction," and that he may hire his own dentist, but any treatment provided by the DOCCS staff "will be in accordance with [DOCCS Health Service Policy Manual] HSPM 2.01."

On or about January 9, 2013, a temporary filling placed by Dr. Stukes on tooth No. 2 fell out. On the same day, Ciaprazi wrote to Dr. Jacobson, requesting that the filling be replaced.

Dr. Jacobson did not respond or call Ciaprazi to his office for treatment.  On January 22, 2013, Ciaprazi wrote to Dr. Jacobson about the absent filling, with a copy sent to the Superintendent of Sing Sing Correctional Facility.  On January 24, 2013, Dr. Jacobson called Ciaprazi to his office, but refused to replace the temporary filling.  Dr. Jacobson advised Ciaprazi "to fill the tooth with balls of toilet paper and acknowledged that the lack of filling can lead to a serious infection." On January 27, 2013, a wall of tooth No. 2 collapsed.

On January 29, 2013, Ciaprazi filed a grievance, requesting restorative treatment for tooth No. 2.  On February 7, 2013, during an informal meeting requested by Dr. Jacobson, Dr. Jacobson indicated that he was not allowed by DOCCS regulations to perform root canal or place a crown on posterior teeth, and he considered the matter "closed."  In connection with Ciaprazi's No. 2 tooth, Ciaprazi

> experienced repeated bouts of excruciating pain and at least three abscesses during the past two years; a portion of the tooth collapsed, which in turn placed the entire tooth at risk of collapsing; it is almost impossible to masticate on the right side, while at the same time I have problems masticating on the left side . . . ; there is a risk to my health such as widespread infection, loss of bone and other complications.

Lower Left Second Premolar, Tooth No. 20

From May to July 2010, Ciaprazi's dental care provider was Dr. Guerriero.  During that period, Dr. Guerriero performed a root canal on Ciaprazi's lower left second premolar, tooth No. 20, and placed a new filling in it.  On April 26, 2012, Ciaprazi reported to Dr. Jacobson complaining that the filling on tooth No. 20 broke above the gum line and requested that the broken portion of the filling be replaced.  Dr. Jacobson refused to restore the filling or to permit Dr. Guerriero to do so.  On May 10, 2012, Ciaprazi filed a grievance in connection with the denial of treatment for tooth No. 20.  On May 28, 2012, he wrote to Fischer, Dr. Koenigsmann and Dr. D'Silva.  He received no response from Fischer and Dr. D'Silva.  Dr. Koenigsmann

responded, on June 8, 2012, contending that Ciaprazi refused "'the treatment offered' of

extraction," and that he may hire his own dentist, but any treatment provided by the DOCCS

staff "will be in accordance with [DOCCS Health Service Policy Manual] HSPM 2.01."

Defendants' Policy

The defendants maintain and enforce a policy or custom of denying root canal or any

other restorative treatment to all posterior teeth, providing instead only extraction as a

"treatment" for all posterior teeth.  The defendants' policy is to refuse any restorative treatment

to posterior teeth and to allow them to deteriorate progressively until they break or otherwise

cannot be saved, or to permit infection to spread and any concomitant pain to become so

unbearable as to make prisoners consent to extraction "under compulsion."  This policy affects at

least half of the teeth, namely 16 out of 32 human teeth, and may affect more, since the

defendants did not define what teeth are "anterior" and what teeth are "posterior."  The policy or

custom is generated by DOCCS to save time, effort and money because root canal and other

similar restorative procedures are more time-consuming, labor-intensive and expensive than

extractions.  The prison dentists are not compensated by the DOCCS for root canal or other

restorative treatment performed on "posterior" teeth.  Some DOCCS dentists, including Dr.

Jacobson, claim that they are not allowed by the DOCCS regulation to perform root canal and

other restorative treatment for posterior teeth, even though no such prohibition exists in the

DOCCS regulations.  By enforcing this policy, the defendants ignored deliberately Ciaprazi's

medical condition, his pain and suffering, and placed him at risk of unnecessarily losing at least

three posterior teeth, which can generate further serious dental problems, given that he is already

missing four other posterior teeth.

The defendants' policy is contrary to New York law, because HSPM # 2.01, sections (C)(2) and (C)(2)(g), provide that dental service in the prison setting "will include . . . [e]ndodontic therapy for maxillary and mandibular anterior teeth" and does not limit endodontic therapy, such as root canal, to anterior teeth.  Other sections of HSPM express an obligation inconsistent with the denial of prophylactic and restorative treatment of the posterior teeth and do not distinguish between anterior and posterior teeth.

## DEFENDANTS' CONTENTIONS

### Failure to State an Eighth Amendment Claim

The defendants contend that the plaintiff's claim against Dr. Jacobson must fail because his allegations "fall far short of alleging deliberate indifference to his dental needs."  According to the defendants, the plaintiff "admits that he routinely received medication and medical attention and was offered treatment options for his ailments by Dr. Jacobson," and that "Dr. Jacobson examined him, prescribed antibiotics, and offered to extract his teeth."  The defendants assert that Dr. Jacobson "never denied Plaintiff the right to a root canal or filling replacement," but "only informed Plaintiff that DOCCS' policy does not allow the facility to perform those treatments."  The defendants maintain that the "Plaintiff had the option to hire a dentist at his own expense," and he "refused the treatment options offered by Dr. Jacobson simply because he favored something else and wanted the correctional facility to pay for his preference."  The defendants assert that the plaintiff's claim is "nothing more than a mere disagreement with the appropriate course of treatment and dissatisfaction with the options offered by the correctional facility, neither of which are actionable claims under the federal constitution."  Moreover, the plaintiff did not allege "that Dr. Jacobson had a sufficiently culpable state of mind with respect to Plaintiff's dental needs and acted with conscious recklessness."  The defendants contend that

nothing in the complaint suggest that Dr. Jacobson "was aware that extraction or hiring an outside dentist posed an excessive risk to Plaintiff's health or safety."

The defendants contend that the only claim against "Dr. Willim is that he said he would refer Plaintiff to a dental specialist, but then never made the appointment." However, "the failure to see a medical specialist cannot constitute deliberate indifference," and no allegation exists that Dr. Willim had a sufficiently culpable state of mind when he failed to send the plaintiff to a specialist.

Concerning the plaintiff's claims against Dr. Koenigsmann, Dr. D'Silva and Fischer, the plaintiff makes conclusory allegations unsupported by factual allegations. The plaintiff did not allege that any defendant was "involved in creating or contributing to an unconstitutional policy," or that the supervisory defendants knew of any excessive risk to the plaintiff's safety and deliberately ignored it. The defendants assert that Dr. Koenigsmann responded to the plaintiff's letters, informing him that the facility dentists can treat him, "but the treatment had to adhere to DOCCS' policy." The plaintiff did not allege that Dr. Koenigsmann acted with deliberate indifference to his dental needs.

Failure To Allege Personal Involvement

The defendants contend that the plaintiff's claims against Fischer and Dr. D'Silva should be dismissed because no allegations exist that Fischer or Dr. D'Silva was personally involved in the alleged constitutional violations. The plaintiff only asserted that Fischer and Dr. D'Silva never responded to his letters, which is not sufficient to establish personal involvement.

Qualified Immunity

The defendants contend that they are entitled to qualified immunity because their actions were objectively reasonable. According to the defendants,

Drs. Jacobson and Willim provided Plaintiff with medical treatment and care. They provided antibiotics and Dr. Jacobson recommended that Plaintiff have his teeth extracted - - a treatment that would have alleviated Plaintiff's pain. The fact that Plaintiff has prolonged his pain is a direct result of his own refusal and not because of Drs. Willim's or Jacobson's lack of treatment. Thus, it was objectively reasonable for Defendants to believe that they were not violating clearly established law in recommending an appropriate treatment plan. Although Defendants could not provide the requested treatment, Dr. Koenigsmann gave Plaintiff alternative options, but reiterated that the options had to adhere to DOCCS' policy. Plaintiff refused the options though they would have helped Plaintiff's pain. It was also objectively reasonable for Dr. Koenigsmann, as DOCCS' Chief Medical Officer, to respond to Plaintiff's letters, advising him that medical treatments were available at the facility, but that the treatments must adhere to the facility's policies. Finally, under the law, Commissioner Fischer and Dr. D'Silva were not personally involved in any constitutional violations.

<u>Dismissal of State-Law Claims</u>

The defendants contend that "[a]ny plausible state law claim must be dismissed from this action for lack of subject matter jurisdiction because New York Correction Law § 24 requires that any state claim against a current or former DOCCS employee relating to actions taken during their employment should be brought against the State of New York in the New York Court of Claims." According to the defendants, they were all employed by DOCCS during the relevant period.

## PLAINTIFF'S CONTENTIONS

Ciaprazi contends that his claim concerning tooth No. 13 is not based on any disagreement with the DOCCS' decision, but on the referral to a specialist by Dr. Stukes, permitted by HSPM, and "its evident implication that the specialist referral is medically necessary." According to Ciaprazi, his case is different from the cases upon which the defendants rely in their motion, because in those cases "the idea of referral was of the prisoner himself, not the dental staff." Ciaprazi contends his case is more akin to those "where the defendants prevented the plaintiff from obtaining treatment that they knew was recommended to

9

him." Furthermore, Ciaprazi alleged in detail that the defendants' decision not to honor Dr.

Stukes's referral was not based on professional judgment, but on Dr. Jacobson's view that he

was "new" and had no obligation to act on the previous referral, as well as "on a series of blatant

lies that I already had an appointment." The defendants did not explain their decision not to act

on Dr. Stukes's referral, as to make their decision reasonable and show that his claim is one of

mere disagreement, which also distinguishes Ciaprazi's case from those where the defendants

provided a plausible explanation for their medical decision. Ciaprazi contends that he was never

provided any adequate alternative treatment, since "[a]ntibiotics are not a permanent cure for a

dental infection, especially where the situation involves a failed root canal." The defendants'

offer to extract his teeth was based on DOCCS' policy of not allowing restorative treatment for

posterior teeth. Ciaprazi asserts that

> the specialty referral made by dentist Stukes confirms that the tooth is medically
> restorable - or certainly would have been if her decision had been timely acted on.
> Accordingly, the offer to extract a perfectly restorable tooth makes as much sense
> as offering to sever any other concededly salvageable body part - it is absurd on its
> face and inadequate.

Ciaprazi contends that the defendants failed "to justify the policy invoked by defendant Jacobson

as medically sound," as "[n]o sound medical policy would exclude, without any medical reasons,

half of the teeth from endodontic treatment and offers [sic] only extraction for otherwise easily

restorable teeth." Ciaprazi asserts that, since DOCCS recognizes in its regulations that it must

provide rehabilitative dental services to its prisoners, "there exists no basis whatsoever for the

defendants to pretend that offering to extract the restorable tooth in question is reasonable or

adequate." Thus, whether the defendants acted reasonably must be assessed in light of the

regulations.

Concerning Ciaprazi's No. 2 tooth, he contends that Dr. Jacobson acknowledged it could be saved with root canal, but denied treatment solely based on a reason unrelated to health care, namely the DOCCS' policy of not allowing restorative procedures on posterior teeth. Ciaprazi did not merely disagree with the treatment offered for his No. 2 tooth. Dr. Jacobson's refusal to replace the filling and his advice to fill the tooth with balls of toilet paper were not reasonable.

Ciaprazi contends that the only problem with his No. 20 tooth was a broken filling, but the defendants' policy of denying endodontic treatment to posterior teeth prevented the filling replacement procedure. Ciaprazi maintains that extracting his No. 20 tooth was not medically necessary and his "refusal to consent to a glaringly unnecessary extraction is not a 'mere disagreement' with Jacobson." The defendants' position, "that the *only* treatment available to the prisoners is extraction, regardless of the dental problem involved, and however patently clear it is that the teeth involved can be easily saved with simple dental procedures such as filling[,] is absurd and unconstitutional on its face."

Ciaprazi contends that Dr. Willim agreed that he needed to be referred to a specialist for treatment; thus, preventing him from receiving that recommended treatment violates his constitutional rights. He maintains that his allegations make it clear that Dr. Jacobson and Dr. Willim knew that, by leaving his "teeth untreated deterioration will likely result, along with pain and other complications." Both defendants disregarded the known risks. Dr. Willim did nothing with respect to tooth No.13, except promise that the appointment with a specialist would take place. Dr. Jacobson did not provide any explanation for his failure to replace the filling in tooth No. 20. Moreover, providing antibiotics as a temporary solution, without any follow-up with restorative treatment amounts to unjustified recklessness towards Ciaprazi's health. Ciaprazi asserts that the length of the defendants' persistence in not providing adequate treatment also

reflects on their recklessness.  Given that the referral to the specialist for tooth No. 13 was made
in May 2011, the defendants neither acted on that referral nor took steps to provide alternative
restorative treatment for more than two years and seven months.  With respect to tooth No. 2,
Ciaprazi had severe pain and abscesses since at least November 2011, indicating an ongoing
infection, yet more than two years and one month later, the defendants had not provided
restorative treatment.  Similarly, more than one year and eight months elapsed since he reported
the broken filling in tooth No. 20, but the filling has never been replaced.  Furthermore, the
allegations show that the defendants' refusal to provide restorative treatment was not based on
sound dental-health-care judgment, but on the defendants' policy "to deny treatment for
posterior teeth."  Ciaprazi also alleged that the reason for not providing restorative treatment of
posterior teeth is financial, which is confirmed by the defendants' motion, and shows a culpable
state of mind.  He asserts that the defendants "get-your-own-dentist policy" is absurd, in light of
his incarceration and indigent status, as the defendants know that he had been incarcerated for a
very long time and is unable to afford a dentist.  Thus, giving an "option" to Ciaprazi to hire his
own dentist "is not an option at all but sheer cynicism that further reflects on [the defendants']
culpable conduct."

Ciaprazi contends that, contrary to the defendants' assertion that he failed to allege their
involvement in creating or contributing to an unconstitutional policy, he "clearly alleges that the
defendants maintain a policy of automatically denying restorative treatment for restorable
posterior teeth, solely for financial reasons."  Dr. Koenigsmann's written response that the denial
of treatment for posterior teeth is in accordance with the DOCCS' policy and that if Ciaprazi
wanted such treatment he could hire his own dentist, is sufficient "to show, at least at this stage,
that this defendant contributed to perpetrating this unconstitutional policy" and is "responsible

for misinterpreting the meaning of HSPM # 2.01 to produce such policy." Moreover, Dr. Koenigsmann knew that not treating infected teeth is a serious matter resulting in severe pain, deterioration and other severe consequences.

Ciaprazi asserts that he alleged that Fischer maintained and enforced a policy or custom of denying restorative treatment to all restorable posterior teeth, thus, Fischer's personal involvement is pled sufficiently. Concerning Dr. D'Silva, she is the "definitive authority on the delivery of dental care in DOCCS," and she is "ultimately responsible for insuring that the inmate population has timely access" to dental care. According to Ciaprazi, since "the defendants believe that HSPM # 2.01 contains a prohibition on the treatment of posterior teeth, it is also defendant D'Silva who could have issued a variance from such prohibition." He maintains, it is "at least plausible that D'Silva created the policy or custom of deliberate denial of restorative treatment for posterior teeth, 'or allowed continuance of such a policy or custom.'"

Ciaprazi contends that, although courts are divided on the issue whether the supervisory defendants are involved in a constitutional violation when they received grievances but failed to act on them, the Second Circuit held that such a circumstance is sufficient to show personal involvement. Moreover, beyond the fact that Fischer and Dr. D'Silva received his grievances, the issue of what they knew is a question of fact requiring discovery. Ciaprazi contends that, even if the claims against Fischer and Dr. D'Silva fail for lack of personal involvement in the alleged constitutional violations, "they *certainly* know about it now - and yet they *still* continue to deny me adequate treatment."

Ciaprazi contends that the defendants are not shielded by qualified immunity because their actions were not objectively reasonable, since Dr. Willim and Dr. Jacobson knew that his was a serious dental condition but failed to provide permanent restorative treatment for his teeth.

13

Since Dr. Koenigsmann did what he was prohibited by HSPM # 2.01 and the Second Circuit caselaw from doing, he cannot claim that he believed his actions were objectively reasonable. Moreover, his liability is not based solely on the content of his letter to Ciaprazi, but on the allegation that he created or continued the unconstitutional policy.

Ciaprazi asserts that dismissal of the state-law claims is not warranted because, even "assuming arguendo that Correction Law § 24 is applicable to federal courts, that statute would be nevertheless preempted both by the U.S. Constitution and 28 U.S.C. § 1332(a)" because "[t]he jurisdiction of the district court is determined by the Congress, not by state law." According to Ciaprazi, even if "Correction Law § 24 would pose a jurisdictional bar to recovery of damages under state law, it does not pose a bar to pursuing injunctive relief under that law."

## DEFENDANTS' REPLY

The defendants contend that, "[w]hile the complaint contains many allegations relating to Plaintiff's dental condition and at first glance, it may appear to state a claim against some of the defendants, . . . the gravamen of his allegations is that he disagrees with the decision to extract his teeth rather than perform root canals and/or replace fillings, which is not a constitutional claim." According to the defendants, Dr. Jacobson never denied the plaintiff his right to a root canal or filling replacement; but only informed him that DOCCS' policy does not allow the facility to perform those treatments. They assert that, notwithstanding Dr. Stukes' referral to a specialist, "[i]f subsequent dentists, after having examined Plaintiff, concluded that there should be a different course of treatment and that Plaintiff did not need a specialist, then that is a disagreement among medical professionals, not deliberate indifference." Moreover, the plaintiff failed to allege that Dr. Jacobson intended to cause pain to him or knew of an excessive risk to him and deliberately ignored it. At best, the plaintiff's claim is one of dental malpractice.

14

The plaintiff does not allege that "Dr. Willim knew that the appointment was never made," or that the "Plaintiff informed Dr. Willim that an appointment was never made," or that "Dr. Willim is responsible for scheduling appointments," or that "he acted with deliberate indifference. The defendants maintain that the plaintiff makes only conclusory allegations against Dr. Koenigsmann, Dr. D'Silva and Fischer. No allegations of Fischer's and Dr. D'Silva's personal involvement exist, and the receipt of the plaintiff's grievances alone is not enough to show personal involvement. Moreover, "Fischer is not a dental professional."

The defendants contend that, to the extent that the plaintiff claims that the defendants violated his constitutional rights "because they did not follow certain DOCCS' directives," violations of DOCCS' directives are not actionable under a section 1983 claim. The defendants maintain that they are shielded by qualified immunity. They contend that "section 24 . . . does provide immunity for claims under state laws." Furthermore, the plaintiff's request for a preliminary injunction is premature, and he did not make a motion under Rule 65 of the Federal Rules of Civil Procedure or "[provide] a scintilla of evidence, by affidavit or otherwise, that would allow a court to grant such an extraordinary relief."

## DISCUSSION

### *Rule 12(b)(6) of the Federal Rules of Civil Procedure*

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they *suggest*.'" Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (citation omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has

> facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.
>
> Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).

"Conclusory allegations that the defendant violated the standards of law do not satisfy the need for plausible factual allegations." Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 191 (2d Cir. 2010) (citing Twombly, 550 U.S. at 555, 127 S. Ct. at 1965).  On a motion pursuant to Rule 12(b)(6), all facts alleged in the complaint are assumed to be true and all reasonable inferences are drawn in the plaintiff's favor.  See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n, 655 F.3d 136, 141 (2d Cir. 2011).

***Eighth Amendment Deliberate Indifference Claim***

To state a claim under Section 1983, a plaintiff must allege that: "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." Annis v. Cnty. of Westchester, 136 F.3d 239, 245 (2d Cir. 1998).  The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.  "The Cruel and Unusual Punishment Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). "To establish an Eighth Amendment violation arising out of inadequate medical treatment, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976)).  The plaintiff must establish both the objective and subjective elements of the claim, respectively: (1) the deprivation of medical treatment exposed the plaintiff "to conditions that pose an unreasonable risk of serious damage to [the plaintiff's] future health"; and (2) "[t]he

16

prison official [knew] of, and disregard[ed], an excessive risk to inmate health or safety."

Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012) (quotation marks and citation omitted).

Concerning the objective, first element, "the alleged deprivation of adequate medical care must be 'sufficiently serious.'" Salahuddin, 467 F.3d at 279 (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324 (1991)).

> This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

> Id. at 280 (internal quotation marks and citations omitted).

Concerning the subjective, second element, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994).

Objective Element: Serious Medical Needs

Ciaprazi alleges that, in connection with his No. 13 tooth, he suffered numerous abscesses, including in May 2010, May 2011, August 2011 and April 2012, for which he was prescribed antibiotics and pain medication. In connection with tooth No. 13, Ciaprazi experienced bouts of excruciating pain, a lump grew and remained in the gum surrounding the

17

tooth for several months in 2012, he has a tingling and throbbing sensation that developed over the past several months in tooth No. 13 and the surrounding gums and he has problems masticating on the left side.  Dr. Stukes advised Ciaprazi that she made a written referral for him to consult and obtain treatment from a specialist because he needed a root canal on tooth No. 13. Dr. Willim advised Ciaprazi that he needed a surgical intervention on tooth No. 13, and promised to make an appointment with a specialist for him.  Concerning tooth No. 2, Ciaprazi had at least three abscesses and suffered excruciating pain, a portion of that tooth collapsed and it is almost impossible to masticate on the right side, while at the same time having problems masticating on the left side because of tooth No. 13.  A wall of Ciaprazi's No. 20 tooth collapsed after his filling fell out and was not replaced.  His teeth have deteriorated visibly and progressively.

Dr. Stukes determined that root canal was needed and prepared a root canal referral for Ciaprazi's No. 13 tooth, and Dr. Willim determined that Ciaprazi needed a surgical intervention on that tooth; these facts show that Ciaprazi's condition was sufficiently serious.  Ciaprazi's allegations of excruciating pain over a long period of time, multiple abscesses on more than one tooth, a collapsed tooth wall and almost impossible mastication, which is a daily activity necessary for survival, are sufficiently serious to satisfy the objective prong of the deliberate indifference claim at this stage of the litigation.  See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998) (the plaintiff's allegations that "he suffered extreme pain, his teeth deteriorated, and he has been unable to eat properly" are sufficient to show the objective element on a motion to dismiss).

Subjective Element: Deliberate Indifference

"It is well-established that mere disagreement over the proper treatment does not create

18

a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might

prefer a different treatment does not give rise to an Eighth Amendment violation." Id. at 703.

The defendants contend that "it is well settled that the failure to see a dental specialist is not an

Eighth Amendment violation," but do not make citation to any binding authority for that

proposition; instead, they rely on Shepherd v. Powers, No. 11 Civ. 6860, 2012 WL 4477241

(S.D.N.Y. Sept. 27, 2012) and Adams v. Perez, No. 08 Civ. 4834, 2009 WL 513036 (S.D.N.Y.

Feb. 27, 2009).

In Shepherd, the plaintiff made contradictory allegations in the complaint that "he never

received an examination for the pain in his back," and that "he received over-the-counter

medication to treat his pain and that he was provided an X-ray.  Shepherd, 2012 WL 4477241, at

*6.  The plaintiff's contention that "he was denied a referral to a specialist and an M.R.I." was

rejected by the court because the plaintiff did not plead "any facts in support of his claim that

treatment by a specialist or an M.R.I. was medically necessary." Id.  Similarly, in Adams, the

plaintiff alleged that she received inadequate treatment because the doctor failed to send her for

an M.R.I. and to refer her to a pain specialist.  Adams, 2009 WL 513036, at *3.  The plaintiff's

claim was rejected by the court because x-rays were taken of her injuries in the infirmary and she

received at least four prescriptions for her pain and saw the doctor on at least three occasions.

Id. at 4.

Unlike the plaintiffs in Shepherd and Adams, Ciaprazi asserted sufficiently that root

canal for his No. 13 tooth was medically necessary because he received a referral to a specialist

from Dr. Stukes, and Dr. Willim advised him that he needed a surgical procedure on that tooth.

Thus, contrary to the defendants' contention, Ciaprazi's claim is not one of "mere disagreement

with the appropriate course of treatment and dissatisfaction with the options offered."  Dr.

19

Willim's advice that Ciaprazi needed surgical intervention on tooth No. 13 demonstrates that Dr. Willim knew that a substantial risk of serious harm existed, but he disregarded that risk recklessly when he failed to make an appointment for Ciaprazi to see a specialist.  Moreover, Ciaprazi did not receive a replacement filling for his No. 2 tooth, and, shortly thereafter, the wall of that tooth collapsed.  Dr. Jacobson's advice "to fill the tooth with balls of toilet paper," coupled with his acknowledgment that the lack of filling can lead to a serious infection, indicates that Dr. Jacobson was aware of the risk involved in not providing adequate treatment, and that he ignored that risk recklessly, by failing to treat tooth No. 2 and suggesting the use of toilet paper balls to fill the tooth.  Moreover, Dr. Jacobson acknowledged that Ciaprazi's No. 2 tooth can be saved by a root canal but refused to perform that procedure based on the DOCCS' policy prohibiting the treatment of posterior teeth.  Similarly, Dr. Jacobson refused to replace the broken filling in tooth No. 20 and offered to extract that tooth instead, which also demonstrates that he was aware of the seriousness of an untreated broken filling.  Dr. Jacobson disregarded recklessly that risk when he offered to extract tooth No. 20, because, given that Ciaprazi is already missing four posterior teeth, extracting more posterior teeth such as Nos. 13, 2 and 20, based on the policy prohibiting the restorative treatment of posterior teeth, would leave the plaintiff ultimately with not many teeth for masticating and eating.  Thus, an offer to extract posterior teeth rather than perform restorative treatment does not appear to be an adequate treatment.  Dr. Willim and Dr. Jacobson knew that and disregarded recklessly the risk that the failure to treat Cipriazi's posterior teeth would cause serious damage to his future health.

Furthermore, "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan."  Chance, 143 F.3d at 703.  In the circumstance of this case, where Dr. Stukes and Dr. Willim advised that a surgical

20

procedure was needed, and Dr. Jacobson knew that prescribing antibiotics and pain medication was not going to solve Ciaprazi's dental problems, offering to extract teeth constitutes deliberate indifference to Ciaprazi's dental needs for the purpose of this motion.  Thus, Ciaprazi alleged sufficiently, at this stage of the litigation, that Dr. Willim and Dr. Jacobson acted with deliberate indifference.

Similarly, Ciaprazi stated that Dr. Koenigsmann responded to his grievance by a letter in which he stated that Ciaprazi had the opportunity to address his dental issues when he saw the oral surgeon, Dr. Moore, on September 14, 2011.  However, taking Ciaprazi's allegation as true, the September 14, 2011 appointment with Dr. Moore was limited solely to the extraction of an unrelated wisdom tooth, and Dr. Moore confirmed that when he advised Ciaprazi that the only purpose of the appointment was to extract his wisdom tooth.  Thus, after having learned about Ciaprazi's grievance and in light of the fact that the September 14, 2011 appointment with Dr. Moore was solely for the purpose of extracting Ciaprazi's wisdom tooth, Dr. Koenigsmann failed to remedy the wrong.  Thus, at this stage of the litigation, Ciaprazi has made a plausible allegation of an Eighth Amendment violation against Dr. Koenigsmann.

### Personal Involvement of Fischer and Dr. D'Silva

To establish a Section 1983 claim against government officials, including supervisors, a plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Iqbal, 556 U.S. at 676, 129 S. Ct. at 1948.  In the Second Circuit,

> [t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or

custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

The Second Circuit has not yet addressed what, if anything, remains of the five ways of showing personal involvement of supervisory defendants after Iqbal, see Hogan v. Fischer, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), 'may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations.'"), "and the district courts in this Circuit, as well as the other courts of appeals, have grappled with this question and reached conflicting results." Turkmen v. Ashcroft, 915 F. Supp. 2d 314, 335 (E.D.N.Y. 2013) (listing cases).  However, absent Second Circuit authority to the contrary, the Court finds that Iqbal did not abrogate the five forms of evidence showing personal involvement, as articulated in Colon, 58 F.3d at 873.  See, e.g., Ramey v. Perez, No. 1:13 Civ. 00017, 2014 WL 407097, at *4 (S.D.N.Y. Jan. 31, 2014) ("*Colon* remains the standard in this Circuit for deciding whether personal involvement by supervisory officials is sufficiently alleged in the context of the Eighth Amendment."); but see Richardson v. Dep't of Corr., No. 10 Civ. 6137, 2011 WL 710617, at *2 (S.D.N.Y. Feb. 28, 2011) (stating that only "the first and third Colon factors have survived the Supreme Court's decision in *Iqbal*."); Kleehammer v. Monroe County, 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) ("Only the first and part of the third *Colon* categories pass *Iqbal's* muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred.").  "While mere receipt of a

letter from a prisoner is insufficient to establish individual liability, an official's actions and responses arising out of a grievance may." Bodie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004).

Ciaprazi alleges that Fischer and Dr. D'Silva "maintain and enforce a policy or custom of denying root canal or any other restorative treatment to all posterior teeth, and of providing instead as 'treatment' only extraction for all posterior teeth that may otherwise be restored and saved through root canal." He was advised by more than one dentist that "the DOCCS Central Office generated this policy or custom in order to save time, effort and money because root canal and other similar restorative procedures are more time-consuming, labor-intensive and expensive than extractions," and "[t]he prison dentists are also apparently not compensated by the DOCCS for root canal or other restorative treatment performed on 'posterior' teeth." Ciaprazi's plausible allegations of the deliberate indifference to his dental needs, specifically his posterior teeth, illustrate and support his allegations that the defendants maintain and enforce the policy or custom of "refusing to provide readily available treatment to save" posterior teeth. Moreover, Fischer and Dr. D'Silva are aware of the policy because Ciaprazi complained about it in his letters to them. However, Fischer and Dr. D'Silva failed to act and continued to maintain and enforce the policy, notwithstanding that DOCCS regulations do not prohibit restorative treatment of posterior teeth. Accordingly, Ciaprazi's allegations, that Fischer and Dr. D'Silva maintain and enforce the policy of refusing to provide restorative treatment to posterior teeth and that by doing so they deliberately disregard his constitutional rights, are sufficiently plausible at this stage of the litigation to indicate the personal involvement of Fischer and Dr. D'Silva.

### *Qualified Immunity Defense*

Qualified immunity is an affirmative defense shielding government officials performing

23

discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

> To determine whether a right is clearly established, we look to (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful.

> Scott v. Fischer, 616 F.3d 100, 105 (2d Cir. 2010).

A right claimed to be violated must be clearly established "at the time of the conduct at issue." Davis v. Scherer, 468 U.S. 183, 197, 104 S. Ct. 3012, 3021 (1984).

The defendants do not contend that the Eighth Amendment right to adequate medical care was not clearly established at the time of the conduct at issue, but contend that their "actions were objectively reasonable" because: (i) "Drs. Jacobson and Willim provided Plaintiff with medical treatment and care," and (ii) "[a]lthough Defendants could not provide the requested treatment, Dr. Koenigsmann gave Plaintiff alternative options, but reiterated that the options had to adhere to DOCCS' policy"; however, the plaintiff "refused the options though they would have helped Plaintiff's pain." As discussed above, and as the plaintiff contends, "[t]he offer to extract restorable teeth was absurd on its face," given the limited number of human teeth and the finality of the extraction, and neither Dr. Willim nor Dr. Jackson "could have objectively entertained the notion that these actions did not violate [Ciaprazi's] right to adequate care for a serious medical condition." This is so because Dr. Willim advised the plaintiff that he needed a surgical procedure and Dr. Jacobson, conceding the risk of serious complications from the tooth infection, refused to provide restorative treatment and told Ciaprazi "to fill [the tooth] with balls of toilet paper." Moreover, the prison dentists' refused to provide restorative treatment and

24

offered extraction based on the defendants' policy prohibiting restorative treatment of posterior teeth, and not based on what was adequate treatment in their professional judgment.  In light of the plausible allegations of constitutional violations, the defendants are not entitled to qualified immunity at this stage of the litigation.

***New York Corrections Law § 24***

Ciaprazi asserted diversity jurisdiction, pursuant to 28 U.S.C. § 1332, and supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, for his state-law claims.  The defendants only challenge "pendent jurisdiction" basis for Ciaprazi's state-law claims, asserting that, "when confronted with pendent jurisdiction, a federal court must look to the substantive law of the state in adjudicating state claims," and "New York Correction Law § 24 requires that any state claim against a current or former DOCCS employee relating to actions taken during their [sic] employment should be brought against the State of New York in the New York Court of Claims."

The defendants' motion to dismiss is based entirely on Rule 12(b)(6), including the ground that the "Plaintiff's state claims are barred by N.Y. Corrections Law § 24."  However, a challenge to subject matter jurisdiction is governed by Rule 12(b)(1), not Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The distinction between Rule 12(b)(6) and Rule 12(b)(1) standards is significant.  When "considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  "However, where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," LeBlanc v.

Cleveland, 198 F.3d 353, 356 (2d Cir. 1999), and in that case, the party "asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). Thus, the defendants' challenge to "pendent jurisdiction" over the state-law claims is considered under Rule 12(b)(1)'s standard. However, the defendants did not submit any evidence outside the pleadings.

"Any claims for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state." Correction Law § 24(2). New York's "Correction Law § 24 denies state courts authority to entertain damages actions against correction officers." Haywood v. Drown, 556 U.S. 729, 739, 129 S. Ct. 2108, 2116 (2009). "This provision, by its plain terms, precludes the assertion of claims against corrections officers in any court, including the federal courts . . . because a federal court acts essentially as a state court in addressing pendent state law claims." Baker v. Coughlin, 77 F.3d 12, 15 (2d Cir. 1996). The Second Circuit explained:

> In applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim. This includes any restrictions set by the state on whether a plaintiff may bring a court action regarding the claim. If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction, standing in the shoes of a state court, must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court.
>
> Promisel v. First Am. Artificial Flowers, 943 F.2d 251, 257 (2d Cir. 1991) (internal citations omitted).

Accordingly, although "Section 24 is not a bar to claims against corrections officers and employees under § 1983, . . . it does provide immunity for claims under state laws." Parris v. N.Y. State Dep't of Corr. Servs., 947 F. Supp. 2d 354, 365 (S.D.N.Y. 2013). Correction Law

§ 24 divests this federal court of supplemental jurisdiction over the state-law claims against the defendants.  Therefore, no supplemental jurisdiction for Ciaprazi's state-law claims exists.

However, the defendants do not challenge Ciaprazi's allegation of diversity jurisdiction under 28 U.S.C. § 1332 over his state-law claims.  "The party invoking federal jurisdiction . . . must allege a proper basis for jurisdiction in his pleadings."   Linardos v. Fortuna, 157 F.3d 945, 947 (2d Cir. 1998) (internal citation omitted).

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . . citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subject of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State.

28 U.S.C. § 1332(a)(2).

"Whenever a general rule as to property or personal rights, or injuries to either, is established by State legislation, its enforcement by a Federal court in a case between proper parties is a matter of course, and the jurisdiction of the court, in such case, is not subject to State limitation."  Ry. Co. v. Whitton's Adm'r, 80 U.S. 270, 286 (1871); see Sola Elec. Co. v. Jefferson Elec. Co., 317 U.S. 173, 176, 63 S. Ct. 172, 173 (1942) ("It is familiar doctrine that the prohibition of a federal statute may not be set at naught, or its benefits denied, by state statutes or state common law rules.").

Since the defendants do not challenge Ciaprazi's assertion of diversity jurisdiction, the Court considers whether Ciaprazi alleged a proper jurisdictional basis for his state-law claims in the complaint.  Ciaprazi alleged that he: (i) suffered damages in excess of $75,000; and (ii) is a citizen of Romania and the defendants are "American" citizens whose addresses were at all relevant times at Sing Sing Correctional Facility in Ossining, New York and Albany, New York.

27

Thus, Ciaprazi asserted diversity jurisdiction with respect to his state-law claims properly under 28 U.S.C. § 1332(a)(2), because he is an alien suing citizens of a state of the United States. Given that the defendants do not challenge diversity jurisdiction as a basis for the court to entertain the state-law claims and neither the statute by its explicit language nor any other authority appears to require that an alien asserting jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) must affirmatively negate permanent residency in the United States, the Court finds that Ciaprazi asserted diversity jurisdiction properly.  Moreover, since diversity jurisdiction exists over the state-law claims, Correction Law § 24 cannot divest the district court of its diversity jurisdiction premised on a federal statute, namely, 28 U.S.C. § 1332(a)(2).  Thus, dismissing Ciaprazi's state-law claims, for lack of subject matter jurisdiction, is not warranted.

## RECOMMENDATION

For the foregoing reasons, I recommend that the defendants' motion to dismiss, Docket Entry No. 28, be denied.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, 500 Pearl Street, Room 1350, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 425, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge Crotty.  ***Failure to file objections within fourteen (14) days will result in a waiver of objections and will preclude***

***appellate review.***   See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash,

328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York                    Respectfully submitted,
       June 17, 2014

                                                                    KEVIN NATHANIEL FOX
                                                                     UNITED STATES MAGISTRATE JUDGE

Copy mailed to:

Robert Ciaprazi